**XUE & ASSOCIATES, P.C.**
Benjamin B. Xue
1 School Street, Suite 303A
Glen Cove, NY 11542
Telephone: (516) 595-8887
Facsimile: (212) 219-2276
Email: benjaminxue@xuelaw.com

**LILAW INC.**
J. James Li (Pro Hac Vice to be filed)
1905 Hamilton Avenue, Suite 200
San Jose, California 95125
Telephone: (650) 521-5956
Facsimile:  (650) 521-5955
Email: lij@lilaw.us

Attorneys for Plaintiff Jun Zhang

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Jun Zhang, a.k.a., June Zhang, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>Gain Capital Holdings, Inc., a Delaware corporation,<br><br>        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Jun Zhang (hereinafter "Plaintiff"), brings this class action under Rule 23 of the Federal Rules of Civil Procedure against Gain Capital Holdings, Inc. ("Defendant" or "Gain") for negligence under the federal diversity jurisdiction.

## JURISDICTION

1. Plaintiff is an individual domiciled at all times relevant in Zhengzhou, China.

2. Defendant is a Delaware corporation with its headquarters located at 135 US Highway

1

202/206, Suite 11, Bedminster, New Jersey 07921.

3. This Court has federal diversity jurisdiction under 28 U.S. C. § 1332.

4. This Court is a proper venue under 28 U.S. C. § 1391 because Defendant resides in the State of New Jersey.

## GENERAL ALLEGATIONS

5. Defendant's 2018 annual report contains the following general information regarding its operation:

   a. Its shares are traded on the New York Stock Exchange.

   b. It is "a global provider of trading services and solutions" with customers located in more than 180 countries.

   c. It has branch offices in New York, Illinois, Ohio, United Kingdom, Japan, Australia, China, U.A.E., Poland and Singapore.

   d. It uses a global digital trading platform that can be accessed through web or mobile devices.

   e. Its retail customers are primarily the so-called "self-directed traders," who execute trades on their own behalf. For the year ended December 31, 2018, self-directed customers represented approximately 99.7% of Defendant's retail trading volume.

6. Defendant's 2019 annual report describes its futures trading in the following way:

> Our futures segment provides customers an enhanced experience through our GAIN Trader proprietary trading platform. We have invested in high-speed connectivity to provide access to over 30 global electronic exchanges, which allows us to deliver streaming quotes and high-speed executions. The GAIN Trader platform has a robust suite of trading tools, including charting tools, custom alerts and indicators, as well as automated trading and risk management tools. Our futures segment also provides Trade Desk Manager, a version of our GAIN Trader platform offered to other introducing brokers, which allows them to manage their customers' accounts. In addition, we facilitate connection to our trading services through Application Programming Interface (APIs) from other front-end applications, and we license a white label version of our GAIN Trader platform to select third parties.

Gain's 2018 Form 10-K at 9.

7. According to the annual report, Defendant has several "operating subsidies" including a Cayman Islands registered company named Gain Global Market, Inc. ("GGMI").

8. Plaintiff is a "self-directed trader" who has been using Defendant's GAIN Trade platform for trading derivatives of commodity futures since 2017. Plaintiff first signed up to use Defendant's service in 2017, partly in reliance of Defendant's reputation being a NYSE-listed company. Plaintiff opened a trading account in 2017 with Defendant through its website, Forex.com. The account opening consisted of filling in his personal information and set up his username and password. He did not sign or did not remember signing any contract for opening the account. The entire process takes only a few minutes. Indeed, Defendant's website carried advertisement that boasted "five-minute account opening." In Plaintiff's mind, by opening the trading account on forex.com, he was engaging the trading services by Defendant; and he was never told otherwise.

9. To Plaintiff's understanding, Defendant's platform, GAIN Trade, allows its users like Plaintiff to buy and sell futures derivatives offered by Defendant. It is not an agent which buys and sells futures on behalf of the users. Defendant also hedges on its customers' trading activities to generate profits in both up and down markets. Thus, in the investment terminology, Defendant is an investment dealer instead of a broker, as far as Plaintiff is concerned. Plaintiff understands that the deposit account he opened with Defendant is a form of trust account that is entrusted to Defendant to manage and to debit or credit Plaintiff according to his trading activities on the platform, which will be referred to in shorthand form as the "Trust Account" hereinafter.

10. After he opened the Trust Account with Defendant, Plaintiff received an email from cn.support@foerx.com, which informed Plaintiff that he had completed his account opening but he needed to deposit funds into his account before he started trading. He was given three methods to make the deposit for the Trust Account: the UnionPay bank card, Visa credit card or wire transfer to a bank account of JPMorgan Chase Bank, N.A. located at 270 Park Avenue, New York, NY 10017 (the "NY Bank Account").

11. The service email from forex.com to Plaintiff immediately after the opening of his Trust Account with Defendant in 2017 also included a statement regarding Defendant being the owner of forex.com located at "135 US Hway 202/206, Bedminster NJ, 07921."

12. The owner of the NY Bank Account to which the Trust Account money was wired was shown to have a physical address at 135 U.S. Highway 202/206, Bedminster, New Jersey, which is the address of the Defendant.

13. Plaintiff wired the deposit for the Trust Account to the NY Bank Account which activated his trading privilege on Defendant's trading platform. Even since then, Plaintiff has made innumerable deposits and withdrawals from the Trust Account, all under Defendant's management.

14. One of Plaintiff's major trading activities using Defendant's platform is directed to a Defendant's futures contract named "US_OIL," with a Chinese name literally meaning U.S. Crude Oil. As its name indicates, US_OIL trades crude oil futures through commodity future exchanges in the United States, which are primarily exchanges controlled by the Chicago Mercantile Exchange Group (the "CME Group"). In its essence, the US_OIL monthly contracts closely track the monthly futures contracts of the U.S. crude oil benchmark, West Texas Intermediate or WTI, which are administered by the CME Group.

15. On information and belief, the US_OIL contracts are crude oil futures derivative products that Defendant offered through its trading platform, forex.com, in all relevant times to non-U.S. residents including Chinese residents like Plaintiff.

16. For the US_OIL trading, Defendant provides its customers like Plaintiff with real time quotes from the CME Group for WTI and other oil-related futures in the United States and general research and guidance for the U.S. oil market. Thus, by allowing Plaintiff and other customers to buy and sell US_OIL as a derivative of the WTI futures of the CME Group, Defendant has been acting as Plaintiff's investment dealer and advisor for U.S.-based investments.

17. The instant lawsuit arose from the recent negative pricing of WTI futures. Historically, negative pricing for commodity trading has existed for many years although the CME Group has not allowed it for WTI until recently. On April 3, 2020, the CME Group announced to its CME Globex and Market Data customers that effective April 5, 2020 futures and options including crude oil "will be flagged as eligible to trade at negative prices." https://www.cmegroup.com/notices/electronic-trading/2020/04/20200403.html#pageNumber=1.

18. On April 8, 2020, CME Group publishes an advisory notice which states in relevant

part that if major energy prices continue to fall towards zero in the coming months, CME Clearing has a tested plan to support the possibility of a negative options underlying and enable markets to continue to function normally." https://www.cmegroup.com/content/dam/cmegroup/notices/clearing/2020/04/Chadv20-152.pdf.   The advisory notice specifically mentioned WTI Crude Oil futures, RBOB Gasoline futures and Heating Oil futures for possible negative pricing. *Id.*

19. On April 15, 2020, CME Group sent a memorandum to all Clearing Member Firms under the subject "Testing opportunities in CME's 'New Release' environment for negative prices and strikes for certain NYMEX energy contracts." https://www.cmegroup.com/content/dam/cmegroup/notices/clearing/2020/04/Chadv20-160.pdf. The memorandum states that "Support for zero or negative futures and/or strike prices is standard throughout CME systems." *Id.* It also states that "Effective immediately, firms wishing to test such negative futures and/or strike prices in their systems may utilize CME's 'New Release' testing environments." *Id.*

20. On April 20, 2020, the day the WTI May 2020 contracts were set to expire, their pricing dropped to the negative territory, reaching -$40.32 per barrel at its lowest point and closing at -$37.63 per barrel. Throughout this turmoil, however, Defendant's US_OIL contract pricing remained in the positive territory, with the lowest price shown as $0.01 per barrel and the closing price at $0.05 per barrel. Further, approximately 22 minutes before the closing of U.S. crude oil trading on that day, Defendant's US_OIL halted trading, thus dissociating the derivative from its underlying WTI futures contracts.

21. The next morning, on April 21, 2020, Defendant's platform showed the settlement pricing of US_OIL for the May contracts as $0.01. The customer service email on that day did not mention negative pricing, either.

22. However, on April 23, 2020 which was three days after the expiration of the WTI May 2020 contracts, Plaintiff received an email from Defendant announcing that Plaintiff's US_OIL account has been assessed an "adjustment" of -$143,032 due to the negative pricing of WTI's May 2020 contract and that Defendant had withdrawn that adjustment amount from Plaintiff's Trust Account. Plaintiff then had a call made to Defendant's customer service to inquire the reasons for the sudden "adjustment." He was told that it was a decision made by Defendant's trading platform

5

management.

23. On April 27, 2020, through its official WeChat account named "Gain Group forex.com," Defendant published an article entitled "Important Information regarding the Crude Oil Market." This article pretends to be an announcement on April 20, 2020 warning customers of the negative pricing and instituting protective measures against the negative pricing.

24. On April 29, 2020, Defendant published another article through its official WeChat account entitled "Additional Information regarding Crude Oil Market." This article fraudulently refers to the April 27 article as "being published on April 20," in an attempt to rewrite the history.

25. Plaintiff complained several times to Defendant, to no avail. During his complaint process, Defendant sent Plaintiff and its other customers a contract which Plaintiff allegedly executed by opening an account on Defendant's forex.com platform (the "Purported Contract"). This was the first time Plaintiff had ever heard of such a contract.

26. When Plaintiff complained to the National Futures Association ("NFA"), the regulatory group for the futures trading industry based in Chicago and New York, the NFA stated that the US_OIL trading on Defendant's platform was conducted by a subsidiary of Defendant named Gain Global Markets, Inc. ("GGMI"), which is not a member of NFA although Defendant itself is a member of NFA. This was the first time Plaintiff was made aware of GGMI being the market maker for US_OIL and of the artificial distinction between Defendant and GGMI.

## CLASS ACTION ALLEGATIONS

27. Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure ("FRCP") on behalf of himself and of a similarly situated "Class" or "Class Members." Such Class is defined to include all the users of Defendant's trading platform, forex.com, for trading the contracts US_OIL and was damaged first by Defendant's settlement of the May 2020 contracts on or about April 21, 2020 using the lowest displayed price of $0.01 instead of the displayed closing price of $0.05 of the contracts on April 20, 20202 and then by Defendant's imposition of an "adjustment" on or April 23, 2020 based on the negative closing price of the WTI contracts for May 2020.

28. This action has been brought and may properly be maintained as a class action against

6

Defendant pursuant to FRCP 23 because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded or otherwise modified.

*Diversity Jurisdiction*

29. All of the Class Members are, on information and belief, non-U.S. residents because the US_OIL contracts can only be traded by non-U.S. residents. In the unlikely event that some U.S. residents fall into the Class definition, such U.S. residents should be excluded from the Class. Thus, the diversity jurisdiction of this Court will be preserved upon the Class certification.

*Numerosity*

30. At this time, Plaintiff does not know the exact number of Class Members. On information and belief, the number of Class Members should be in the magnitude of hundreds if not thousands.

31. At least fifteen individuals meeting the Class definition have consented to be Class Members. At least 10 more have expressed interest to join the action. Plaintiff, however, does not know the identities of most of the Class Members at this time.

32. Upon information and belief, a more precise Class size and the identities of the individual members thereof are ascertainable through Defendant's records, including, but not limited to Defendant's record of the traders of the US_OIL monthly contracts for May 2020.

33. Plaintiff believes that the Class is so numerous that joinder of all members of the Class is impracticable and the disposition of their claims in a class action rather than incremental individual actions will benefit the Parties and the Court by eliminating the possibility of inconsistent or varying adjudications of individual actions.

34. Members of the Class may be notified of the pendency of this action through Defendant's established communications channels to its customers which may include email and text messages.

*Common Questions of Fact and Law*

35. There exist common questions of fact and law that affect all the Class Members and predominate over the issues affecting only individual Class Members, including:

   a. Whether a Class member is deemed to have signed the Purported Contract simply by signing up to open a trading account on Defendant's GAIN Trade online platform.

   b. Whether the Purported Contract was ever presented to a Class Member for review and consent when he or she opened the GAIN Trade account.

   c. Whether the Purported Contract should be deemed null and void for fraudulent inducement because the "five minute" account opening was not meant for a Class Member to review any contract to open the trading account.

   d. Whether a Class Member is entitled to sue Defendant in this Court in light of the forum non conveniens defense.

   e. Whether Defendant has fiduciary duty to a Class Member by the member's opening a trading account on Defendant's GAIN Trade platform and entrusting Defendant to manage the Trust Account.

   f. Whether Defendant has breached the fiduciary duty owed to a Class Member by settling the US_OIL May 2020 contracts on or about April 21, 2020 using the lowest shown pricing instead of the closing pricing of the contracts.

   g. Whether Defendant has breached the fiduciary duty owed to a Class Member by deducting a substantial amount of "adjustment" on or about April 23, 2020 from the member's Trust Account based on the negative closing price of the WTI May 2020 contracts in the United States.

   h. Whether Defendant was liable to a Class Member for failure to implement negative pricing for US_OIL contracts before April 20, 2020.

   i. Whether Defendant attempt to fabricate evidence to shift the liability for the US_OIL trading loss due to the negative pricing to the Class Members.

   j. Whether Defendants breached the fiduciary duty to a Class Member by attempting to conceal its negligence and shifting liabilities to the Class Members.

*Typicality*

36. Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same course of conduct of Defendant and the same Plaintiff-Defendant relationship.

37. Plaintiff and members of the Class each opened a trading account with Defendant, each traded US_OIL contracts with Defendant, and each were damaged by Defendant's shifting its loss due to the negative pricing on April 20, 2020 to them.

*Adequacy of Representation*

38. Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. Plaintiff has retained counsel competent and experienced in litigation in the federal courts, business torts, and class action litigation.

*Superiority*

39. A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class. While the aggregate damages which may be awarded to the members of the Class are likely to be substantial, the damages suffered by many individual members of the Class are relatively small, if compared with cost of litigating the claims. Their residence outside the United States further enhanced their difficulty in prosecuting their claims individually.

40. Plaintiff does not know of any other litigation concerning this controversy already commenced against Defendant by any member of the Class. The likelihood of the individual members of the Class prosecuting separate claims is remote.

41. Individualized litigation would also present the potential for inconsistent judgments, and would increase the delay and expense to all parties and unnecessarily burden the court system

42. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

*Class-Wide Injunctive Relief*

43. Class action is warranted also under FRCP 23(b)(2) because Defendant has acted on

grounds generally applicable to Plaintiff and members of Class, thereby making appropriate final injunctive relief with respect to Plaintiff and Class Members as a whole.

44. Plaintiff seeks injunctive relief on behalf of Class Members on grounds generally applicable to the entire Class in order to enjoin and prevent Defendant for similar wrongdoings of negligence and breach of fiduciary duty.

## COUNT ONE
## BREACH OF FIDUCIARY DUTY

45. Plaintiff realleges and incorporates herein by reference each and every allegation contained above herein as though set forth in full.

46. Defendant is an investment dealer and advisor to Plaintiff and thus owes fiduciary duty to Plaintiff. Under that fiduciary duty, Plaintiff entrusted Defendant with the Trust Account.

47. Defendant breached its fiduciary duty of loyalty to Plaintiff by its self-dealing in detriment to Plaintiff's interest. Defendant initially settled the May 2020 US_OIL contracts at $0.01 which was five-times lower than the contracts' closing price of $0.05 on April 20, 2020. Then assessed an "adjustment" on Plaintiff based on the negative pricing of WTI contracts, which completely altered the nature of the US_OIL investment, converted it from a derivative sold by Defendant to Plaintiff to WTI contracts purchased by Plaintiff on the open markets of the CME Group.

48. Defendants further breached its fiduciary duty of exercising reasonable care in handling Plaintiff's investment. Starting at least on April 8, the CME Group has informed all futures traders of the changes to allow negative pricing for crude oil contracts and provided systems to allow dealers and brokers to test their system for allowing negative pricing. Implementing such changes will only require some minimal programming changes. Yet, by April 20, when the negative pricing happened, Plaintiff's system does not show such pricing at all, which blindsided Plaintiff and prevented Plaintiff from making the correct investment decisions such as selling the contracts to cut loss.

49. Instead of taking the responsibility for the trading loss of US_OIL May contracts due to its own negligence, two days after the expiration of the WTI May contracts, Defendant imposed an

adjustment of $143,032 as Plaintiff's trading loss for US_OIL May contracts and unlawfully withdrew the money from Plaintiff's Trust Account.

50. Further, Defendant has attempted to rewrite the history to defraud its own investors including Plaintiff, by manufacturing a non-existent April 20 warning of the negative pricing.

51. Defendant willfully breached its fiduciary duty to Plaintiff with malice, oppression or fraud, which entitles Plaintiff to recover punitive damages.

## COUNT TWO
## NEGLIGENCE

52. Plaintiff realleges and incorporates herein by reference each and every allegation contained above herein as though set forth in full.

53. Defendant provides Plaintiff with an investment platform with real time quotes and instantaneous trading, Defendant was negligent not to modify its platform after the CME Group had repeatedly warned the negative pricing in crude oil and other oil futures.

54. Defendant's negligence has caused Plaintiff significant damages.

## COUNT THREE
## CONSUMER FRAUD
### (New Jersey Consumer Fraud Act, N.J.S. 56:8-1 et al.)

55. Plaintiff realleges and incorporates herein by reference each and every allegation contained above herein as though set forth in full.

56. Defendant has committed acts of unconscionable commercial practice, deception, fraud, false pretense, false promise, and/or misrepresentation in connection with sale or advertisement of its investment brokerage/dealership services in violation of New Jersey Consumer Fraud Act, N.J.S. 56:8-2 ("NJCFA").

57. Plaintiff seeks refund of moneys acquired by Defendant in violation of NJCFA under N.J.S. 56:8-2.11 & 2.12.

## REMEDIES REQUESTED

58. Wherefore, Plaintiff prays for:

   a. A permanent injunction to bar Defendant from any further wrongdoings similar to the conducts averred herein.

   b. Damages against Defendants in an amount sufficient to compensate Plaintiff and other Class Members for damages resulting from the Acts of Defendant as described, which above is much greater than the sum of $75,000 dollars for Plaintiff alone and which, on information and belief, should be at least in the mid-seven figure for the Class.

   c. For prejudgment interest.

   d. For punitive damages against Defendants.

   e. For reasonable attorney's fees and costs.

   f. For costs of suit herein incurred; and

   g. For other necessary or just relief allowed by law or equity.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 24, 2020  
Glen Cove, New York

**Xue & Associates, P.C.**  
*Attorneys for Plaintiff*

By: /s/ BENJAMIN B. XUE  
Benjamin B. Xue, Esq.  
1 School Street, Suite 303A  
Glen Cove, NY 11542  
Telephone: (516) 595-8887  
Facsimile: (212) 219-2276  
benjaminxue@xuelaw.com