## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JUN ZHANG, a.k.a., JUNE ZHANG, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>v.<br><br>GAIN CAPITAL HOLDINGS, INC., a Delaware corporation,<br><br>               Defendant. | Case No. 3:20-cv-09426 (BRM) (TJB)<br><br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendant Gain Capital Holdings, Inc.'s ("GCH") Motion to Dismiss pursuant to the doctrine of *forum non conveniens* (ECF No. 17) and its Motion to Dismiss Plaintiff Jun Zhang's ("Plaintiff") Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 18). Plaintiff opposed both Motions (ECF Nos. 24, 25) and GCH replied to both oppositions (ECF Nos. 26, 27). Having reviewed the parties' submissions filed in connection with the Motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, GCH's Motion to Dismiss pursuant to the doctrine of *forum non conveniens* is **GRANTED** and its Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is **DENIED AS MOOT**.

## I.   Background

### A.   Factual Background

GCH is a "global provider of trading services and solutions" with customers located in over 180 countries. (ECF No. 1 ¶ 5.) GCH's shares are traded on the New York Stock Exchange and it has offices in New York, Illinois, Ohio, the United Kingdom, Japan, Australia, China, U.A.E., Poland, and Singapore. (*Id.*) It uses a global digital trading platform that can be accessed through the internet and mobile devices. (*Id.*) Its retail customers are composed of "self-directed traders" who execute trades on their own behalf. (*Id.*) In 2018, these self-directed traders represented approximately 99.7% of GCH's retail trading volume. (*Id.*) Trades are executed through GCH's GAIN Trader proprietary trading platform. (*Id.* ¶ 6.) GCH has several operating subsidies, including a Cayman Islands company named Gain Global Market, Inc. ("GGMI"). (*Id.* ¶ 7.)

Plaintiff is a self-directed trader who has been using GCH's GAIN Trader platform to trade derivatives of commodity futures since 2017. (*Id.* ¶ 8.) When Plaintiff opened his account through GCH's website, forex.com, he had to fill in his personal information and set up a username and password. (*Id.*) Plaintiff does not remember signing any contract for opening the account, and the entire process took him only a few minutes. (*Id.*) Plaintiff alleges GCH's website included advertisements boasting "five-minute account opening." (*Id.*) To Plaintiff's understanding, GCH's platform allows its users to buy and sell futures derivatives offered by GCH—it is not an agent which buys and sells futures on behalf of the users. (*Id.* ¶ 9.) GCH also hedges on its customers' trading activities to generate profits in both up and down markets, so "in the investment terminology," GCH is an investment dealer instead of a broker, "as far as Plaintiff is concerned." (*Id.*) Plaintiff understands the deposit account he opened with GCH is a trust account (the "Trust

Account") that entrusts GCH "to manage and to debit or credit Plaintiff according to his trading activities on the platform." (*Id.*) After opening his account, Plaintiff received an email from cn.support@forex.com informing Plaintiff he had completed his account opening but needed to deposit funds into his account before he started trading. (*Id.* ¶ 10.) The email included a statement regarding GCH being the owner of forex.com located at "135 US Hway 202/206, Bedminster NJ, 07921," which is the address of GCH. (*Id.* ¶ 11.) The owner of the New York bank account to which the Trust Account money was wired was shown to have a physical address at the same address. (*Id.* ¶ 12.) Since activating his account and depositing the funds necessary to begin trading, Plaintiff "made innumerable deposits and withdrawals from the Trust Account, all under GCH's management." (*Id.* ¶ 13.)

One of Plaintiff's major trading activities using GCH's platform concerns a futures contract named "US_OIL" with a Chinese name literally meaning U.S. Crude Oil. (*Id.* ¶ 14.) US_OIL trades crude oil futures through commodity future exchanges in the United States, which are primarily exchanges controlled by the Chicago Mercantile Exchange Group ("CME Group"). (*Id.*) The US_OIL monthly contracts closely track the monthly futures contracts of the U.S. crude oil benchmark—West Texas Intermediate ("WTI")—which are administered by the CME Group. (*Id.*) On Plaintiff's information and belief, the US_OIL contracts are crude oil futures derivative products that GCH offered through its trading platform, forex.com, at all relevant times to non-U.S. residents including Chinese residents like Plaintiff. (*Id.* ¶ 15.)

For the US_OIL trading, GCH provides its customers with real time quotes from the CME Group for WTI and other oil-related futures in the United States, and general research and guidance for the U.S. oil market. (*Id.* ¶ 16.) By allowing Plaintiff and other customers to buy and sell

US_OIL as a derivative of the WTI futures of the CME Group, Plaintiff alleges GCH has been acting as Plaintiff's investment dealer and advisor for U.S.-based investments. (*Id.*)

Plaintiff alleges this action arose from the negative pricing of WTI futures. (*Id.* ¶ 17.) On April 3, 2020, the CME Group announced to its CME Globex and Market Data customers that effective April 5, 2020, futures and options including crude oil "will be flagged as eligible to trade at negative prices." (*Id.*) Historically, negative pricing for commodity trading has existed for many years, but the CME Group did not allow it until April 5, 2020. (*Id.*) On April 8, 2020, CME Group published an advisory notice which stated, in relevant part, that if major energy prices continued to fall towards zero in the following months, CME Clearing had a tested plan to support the possibility of negative options and enable markets to continue to function normally. (*Id.* ¶ 18.) The notice specifically mentioned WTI Crude Oil futures, RBOB Gasoline futures, and Heating Oil futures for possible negative pricing. (*Id.*)

On April 15, 2020, CME Group sent a memorandum to all clearing member firms under the subject "Testing opportunities in CME's 'News Release' environment for negative prices and strikes for certain NYMEX energy contracts." (*Id.* ¶ 19.) The memorandum stated, "Support for zero or negative futures and/or strike prices is standard throughout CME systems." (*Id.*) It also stated, "Effective immediately, firms wishing to test such negative futures and/or strike prices in their systems may utilize CME's 'News Release' testing environments." (*Id.*)

On April 20, 2020, the day the WTI May 2020 contracts were set to expire, their prices dropped into the negatives, reaching -$40.32 per barrel at its lowest point, and closing at -$37.63 per barrel. (*Id.* ¶ 20.) However, GCH's US_OIL contract pricing remained in the positives, with the lowest price shown as $0.01 per barrel and the closing price at $0.05 per barrel. (*Id.*) On the same day, approximately twenty-two minutes before the closing of U.S. crude oil trading, GCH's

US_OIL trading halted, "thus dissociating the derivative from its underlying WTI future contracts." (*Id.*) On April 21, 2020, GCH's platform showed the settlement pricing of US_OIL for the May contracts as $0.01. (*Id.* ¶ 21.) On April 23, 2020, Plaintiff received an email from GCH announcing that Plaintiff's US_OIL account had been assessed an "adjustment" of -$143,032.00 due to the negative pricing of WTI's May 2020 contract and that GCH had withdrawn that adjustment amount from Plaintiff's Trust Account. (*Id.* ¶ 22.) After inquiring about the adjustment with GCH's customer service, Plaintiff was told the adjustment was a decision made by GCH's trading platform management. (*Id.*)

Plaintiff complained several times to GCH and as part of this complaint process, "[GCH] sent Plaintiff and its other customers a contract which Plaintiff allegedly executed by opening an account on GCH's forex.com platform." (*Id.* ¶ 25.) According to Plaintiff, this was the first time Plaintiff had ever heard of such a contract. (*Id.*) Plaintiff then complained to the National Futures Association ("NFA"), the regulatory group for the futures trading industry based in Chicago and New York, which stated that the US_OIL trading on GCH's platform was conducted by GCH's subsidiary, GGMI. (*Id.* ¶ 26.) GCH is a member of the NFA, but GGMI is not. (*Id.*) Plaintiff alleges this was the first time he was made aware of GGMI being the market maker for US_OIL and of "the artificial distinction between GCH and GGMI." (*Id.*)

On July 24, 2020, Plaintiff filed a three-count putative class action Complaint alleging breach of fiduciary duty (Count I); negligence (Count II); and consumer fraud under N.J. Stat. Ann. §§ 56:8-1, *et seq*. (Count III). (ECF No. 1.) On October 2, 2020, GCH filed two Motions: (1) a Motion to Dismiss pursuant to the doctrine of *forum non conveniens* (ECF No. 17); and (2) a Motion to Dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6)

(ECF No. 18). On November 6, 2020, Plaintiff opposed both Motions (ECF Nos. 24, 25) and on November 24, 2020, GCH replied to both oppositions (ECF Nos. 26, 27).

## II. LEGAL STANDARD

*Forum non conveniens* "requires a decision whether a case 'should be adjudicated elsewhere,' *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007), and 'is the proper mechanism for enforcing a forum selection clause,' *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 180 (3d Cir. 2017)." *Meridian Consulting I Corp., Inc. v. Eurotec Can. Ltd.*, Civ A. No. 1922197, 2021 WL 689132, at *9 (D.N.J. Feb. 22, 2021). "A district court therefore may dispose of an action by a *forum non conveniens* dismissal . . . when considerations of convenience, fairness, and judicial economy so warrant." *Sinochem Int'l Co.*, 549 U.S. at 432. When no forum selection clause is present, a district court must consider the following factors in applying the doctrine of *forum non conveniens*:

> (1) the amount of deference to be afforded to plaintiffs' choice of forum; (2) the availability of an adequate alternative forum where defendants are amenable to process and plaintiffs' claims are cognizable; (3) relevant 'private interest' factors affecting the convenience of the litigants; and (4) relevant 'public interest' factors affecting the convenience of the forum.

*Collins*, 874 F.3d at 186 (quoting *Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 873 (3d Cir. 2013)). However, when a forum selection clause exists, the analysis changes. *See Atl. Marine Const. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 63 (2013). The plaintiff's choice of forum "merits no weight," *id.*, and the court "must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id.* at 64. "Therefore, under *Atlantic Marine*, the remaining factors for the Court to consider are (i) the availability of an adequate alternative forum where [GCH] is amenable to process and Plaintiff's claims are cognizable, and (ii) public interest

factors." *Hage v. Am. Bd. of Obstetrics & Gynecology*, Civ. A. No. 19-21198, 2020 WL 3056442, at *4 (D.N.J. June 9, 2020). "[T]he party resisting application of a forum selection clause . . . bears a heavy burden under *Atlantic Marine*" of establishing the forum selection clause should not be enforced. *Collins*, 874 F.3d at 186–87.

"[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*." *Atl. Marine*, 571 U.S. at 60. "Section 1404(a) is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system." *Id.* But "[f]or the remaining set of cases calling for a nonfederal[, meaning state or foreign,] forum, § 1404(a) has no application, but the residual doctrine of *forum non conveniens* 'has continuing application in federal courts.'" *Id.* at 60–61 (quoting *Sinochem*, 549 U.S. at 430). The forum selection clause here, if applicable, points to the Cayman Islands, a foreign forum, so the Court must apply the doctrine of *forum non conveniens*. *See id*. (noting that "courts should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum." (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 37 (1988))).

## III.  DECISION

GCH asserts when Plaintiff opened his trading accounts on forex.com, he assented to the Customer Agreement, which contains a forum selection clause. (ECF No. 17-1 at 1.) This forum selection clause provides the courts of the Cayman Islands will have "exclusive jurisdiction" over any claim arising under the Customer Agreement. (*Id.*) GCH makes two arguments in relation to the forum selection clause: (1) the forum selection clause is enforceable and (2) the forum selection clause applies to this action. (ECF No. 17-1 at 10–16.) Because of both these arguments, GCH

submits the doctrine of *forum non conveniens* justifies dismissal of this action. (*Id.* at 16–17.) The Court will address each of GCH's main arguments in turn.

### A.     The Forum Selection Clause's Enforceability

GCH argues the forum selection clause applies to this action because Plaintiff had reasonable notice of the clause and affirmatively assented to the Customer Agreement containing the clause. (*Id.* at 10.) GCH also argues Plaintiff cannot demonstrate the forum selection clause is unreasonable. (*Id.* at 11.) Plaintiff argues the Customer Agreement did not provide adequate notice of the clause because it does not qualify as enforceable clickwrap. (ECF No. 24 at 15.)

Online agreements, such as this one, "are generally presented in one of two forms: clickwrap agreements and browsewrap agreements." *Mucciariello v. Viator, Inc.*, Civ. A. No. 18-14444, 2019 WL 4727896, at *3 (D.N.J. Sept. 27, 2019) (citations omitted). "A clickwrap agreement requires a computer user to affirmatively manifest her assent to the terms of contract." *ADP, LLC v. Lynch*, Civ. A. No. 2:16-01053, 2016 WL 3574328, at *4 (D.N.J. June 30, 2016), *aff'd*, 678 F. App'x 77 (3d Cir. 2017). Clickwrap agreements satisfy that requirement "by informing the user that taking such action will comprise her assent to the displayed terms." *Id.* (citing *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007)). Importantly, "clickwrap agreements are routinely upheld." *Mucciariello*, 2019 WL 4727896, at *3; *see also Liberty Syndicates at Lloyd's v. Walnut Advisory Corp.*, Civ. A. No. 09-1343, 2011 WL 5825777, at *4 (D.N.J. Nov. 16, 2011) ("Generally, courts have enforced forum selection clauses in clickwrap agreements, finding that the clickwrap agreement, which collects all of the terms of the agreement in a single dialog box and then requires the user to affirmatively accept the agreement before proceeding, makes every term equally visible."). Alternatively, "browsewrap agreements are not automatically deemed valid." *Mucciariello*, 2019 WL 4727896, at *3; *see also Liberty*

8

*Syndicates at Lloyd's*, 2011 WL 5825777, at *4 (noting that "courts have only enforced the forum selection clauses in browsewrap agreements when the specifics surrounding agreement revealed either that the user knew or should have known about the existence of the terms and conditions that contained the forum selection clause"). However, for both of these agreements, "[t]he central issue . . . is whether or not the forum selection clause is 'immediately visible.'" *Liberty Syndicates at Lloyd's*, 2011 WL 5825777, at *4.

Here, GCH argues "Plaintiff had reasonable notice of the Customer Agreement and its forum selection clause . . . because three different hyperlinks gave Plaintiff notice of the Customer Agreement." (ECF No. 17-1 at 8.) Further, GCH argues "[a]fter Plaintiff saw all three of those links, he affirmatively agreed to be bound by the Customer Agreement when he clicked the checkbox directly below two of those links." (*Id.* at 8–9 (citing Xu Decl. (ECF No. 17-2) ¶¶ 8–9, 16–17).) Therefore, GCH asserts the Customer Agreement and its provisions, including the forum selection clause, are enforceable clickwrap. In opposition, Plaintiff argues the Customer Agreement is not clickwrap because the Customer Agreement interface "does not provide a button to click to agree to [] terms and conditions hyperlinked next to the button." (ECF No. 24 at 15.) Plaintiff asserts the Customer Agreement "is more like a sign-in wrap where the text next to the button does not require the consumer to agree to a hyperlinked 'terms of use'" because "instead, the consumer is presented with a 'statement' in a grey box and is asked to click a button next to the sentence 'I have read and agree to the statement above.'" (*Id.* at 15–16.)

In contrast to clickwrap agreements, sign-in wraps do not "require the use to click on a box showing acceptance of the 'terms of use' in order to continue." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015). Instead, "the website is designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-

in or login process." *Id.*

In *Berkson*, the court reviewed two agreements. The first agreement at issue arose from Berkson's alleged purchase of in-flight Wi-Fi on an American Airlines flight through Gogo, the Wi-Fi provider. If a user were to visit Gogo's webpage and purchase Wi-Fi services during the time Berkson did, they were "confronted with two sign-in buttons on the Gogo webpage." *Id.* at 373. One sign-in button stood entirely by itself in the upper right-hand corner of the webpage, with no language requiring a consumer to agree to "terms of use." *Id.* at 374. Another sign-in button was located in the bottom left-hand corner of the webpage. *Id.* Above this button, the website warns the user "By clicking 'Sign in' I agree to the 'terms of use' and 'privacy policy.'" *Id.* The court emphasized the "terms of use" and "privacy policy" appeared in lowercase font considerably smaller than the "all caps 'SIGN IN' button," and appeared to be hyperlinked. *Id.* Additionally, clicking on the "SIGN IN" button did not display either the "terms of use" or "privacy policy." *Id.*

The court also reviewed a second instance where a consumer could be bound by Gogo's terms. If a consumer were to create an account to access Gogo's services, they would be led to a page that stated: "By clicking 'NEXT' I agree to the *terms of use* and *privacy policy*." *Id.* at 375. The "terms of use" and "privacy policy" were hyperlinked but could only be accessed by clicking the links—clicking on the "NEXT" button would not present either set of terms to the user. *Id.* Classifying the agreement format as "sign-in wrap," the *Berkson* court found Gogo "did not make an effort to draw Berkson's attention to its 'terms of use.'" *Id.* at 404. Ultimately, the court found Berkson was not bound by the agreement's terms because the "hyperlink to the 'terms of use' was not in large font, all caps, or in bold" and the "terms of use" were not "accessible from multiple locations on the webpage," while the "SIGN IN" button was "very user-friendly and obvious, appearing in all caps, in a clearly delineated box in both the upper right hand and the lower left

10

hand corners of the homepage." *Id.* In other words, "[t]he importance of the 'terms of use' was obscured by the physical manifestation of assent, in this case clicking the 'SIGN IN' button, expected of a consumer seeking to purchase in-flight Wi–Fi." *Id.*

The Customer Agreement at issue here arises when a customer applies to open an account through forex.com. Plaintiff provides excerpts of the final page of the account application.[1] (ECF No. 24 at 16.) The portion of the account application Plaintiff attacks provides as follows:

> By selecting the option, I confirm that all the information supplied in this application is correct to my knowledge, and that [I] have read, understood, and agreed to be bound by the terms of the customer agreement. I understand that foreign exchange trading and margin trading of contract for difference involve high risks and thus do not suit every investor. I have read and understood all the information provided to me, including the risk warning notice contained in the customer agreement's attachment 1.

(*Id.*) Importantly, on the application, the above text is in black, while the words "customer agreement" appear in blue, underlined, and hyperlinked text. (ECF No. 24 at 16; ECF No. 17-2 ¶ 12; ECF No. 24-5.) That is, within the three-sentence body of black text, there are two blue hyperlinks referencing the Customer Agreement. These hyperlinks, if clicked, would lead a consumer to the Customer Agreement, which contains the forum selection clause. (ECF No. 17-2 ¶ 14.) Additionally, the text is presented in a light-grey box along with a check box next to the text "I have read and agree to the statement above." (ECF No. 24-5.) Below that, outside of the grey box, there are two additional check boxes. (*Id.*) If the first box is checked, the customer agrees to

---

[1] Plaintiff provides screenshots of GCH's 2019 user interface. (ECF No. 24-5.) Among these screenshots are: the above statement, as translated into English; and a screenshot of the entire webpage where the above statement would be found. (*Id.*) While the full screenshot is not in English, there is a line of check marks (presumably tracking the progress of the application), across the top of the page. (*See id.*) To get to the page where the above text is found, it appears a user would have to proceed through three earlier stages of the application.

receive "news and promotion information" from forex.com. (*Id.*) If the second box is checked, the customer agrees to "receive relevant information or services from affiliates of forex.com and third parties." (*Id.*) The text next to the second box, according to the untranslated, original version of the webpage's screenshot, also contains a blue hyperlink to the privacy agreement. (*Id.*) Underneath the two check boxes outside the grey box is a large green button with the word "submit" to complete the application process. (*Id.*) If an applicant does not check the box next to the text "I have read and agree to the statement above," the application will not be submitted, and the webpage will display a message in red italicized font that states, "You must agree to all terms in order to open an actual account." (ECF No. 17-1 at 7.)

Plaintiff asserts "[t]he two links for 'customer agreement' are almost in the same color as the background grey box, even less visible than the black letter texts." (*Id.* at 16.) Further, "[t]here is no prominent button that says 'I Agree' next to the link for the contract," which the *Berkson* court earmarked as a feature of a valid clickwrap agreement. (*Id.*) Lastly, "[t]he links are also much further away from the prominent button than the invalid sign-in wraps in *Berkson* which display the links right above the buttons." (*Id.*)

The Court disagrees with Plaintiff. The words "customer agreement" are blue and underlined—the words stand out from the rest of the words in the text box, which are all black and not underlined. While there is no "I agree" button next to the link for the contract, courts in this district have enforced agreements with similar features as the Customer Agreement here. *See Mucciariello*, 2019 WL 4727896, at *4; *see also Manopla v. Raymours Furniture Co., Inc.*, Civ. A. No. 3:17-7649, 2018 WL 3201800, at *4 (D.N.J. June 29, 2018) (finding plaintiff had reasonable notice of a forum selection clause when plaintiff checked a box stating "I have read and agreed to the Official Rules" and a hyperlink "signaled by blue ink" told "a user that clicking

the words 'Click Here' would send a user to a different page" containing the forum selection clause). In *Mucciariello*, the plaintiff "was required to provide her personal and billing information, before clicking on the 'Book Now' icon to confirm her purchase." *Id.* Underneath the "Book Now" icon, the webpage contained the message "by clicking Book Now and making a reservation, I acknowledge that I have read and agree to be bound by [the] . . . Terms and Conditions." *Id.* (internal citations omitted). In finding the plaintiff had reasonable notice of the hyperlinked "Terms and Conditions," which contained a forum selection clause, the court relied on the existence of the message affirming the plaintiff had read the "Terms and Conditions" and the presentation of the "Terms and Conditions" on the webpage, which, as here, "were highlighted in blue, in contrast to the surrounding black text" since "that language clearly appeared as a hyperlink that immediately directed the user" to the "Terms and Conditions." *Id.* When a user is "required to take affirmative action to manifest assent and [is] informed that such action will comprise their assent to the displayed terms," that agreement is an enforceable clickwrap agreement. *James v. Glob. Tel\*Link Corp.*, Civ. A. No. 13-4989, 2016 WL 589676, at \*7 (D.N.J. Feb. 11, 2016), *aff'd sub nom., James v. Glob. TelLink Corp*, 852 F.3d 262 (3d Cir. 2017); *see also Davis v. Dell, Inc.*, Civ. A. No. 07-630, 2007 WL 4623030, at \*4 (D.N.J. Dec. 28, 2007), *aff'd*, Civ. A. No. 07-630, 2008 WL 3843837 (D.N.J. Aug. 15, 2008) (providing that clickwrap agreements appear "'on an internet webpage and require[] that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction.'" (quoting *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007))). This affirmative assent can come through checking a box for the terms of service when setting up an account over the Internet, as Plaintiff did here. *See James*, 2016 WL 589676, at \*7; *Davis*, 2007 WL 4623030, at \*4 (holding that, under New Jersey law, "when a party uses his computer to click on a button signifying his

13

acceptance of terms and conditions in connection with an online transaction, he thereby manifests his assent to an electronic agreement"). Plaintiff testified he remembered seeing the statement with the Customer Agreement hyperlinks and checking the box indicating his assent to the terms of the Customer Agreement. (Zhang Decl. (ECF No. 24-1) ¶¶ 27–28 ("I remember that I have seen this 'statement' box before" and "[a]pparently I checked the box saying 'I have read and agree to the statement above'").) Because Plaintiff affirmatively checked a box confirming acknowledgment of the Customer Agreement and because the Customer Agreement was conspicuously presented twice in blue hyperlinked text against a background of black text, the application is an enforceable clickwrap agreement.

Next, GCH argues Plaintiff cannot demonstrate the forum selection clause is unreasonable. (ECF No. 17-1 at 11.) Plaintiff argues the forum selection clause is unconscionable under New Jersey law. (ECF No. 24 at 20–23.) The Court agrees with GCH.

"[F]orum selection clauses are 'prima facie valid and should be enforced unless enforcement is shown by the resisting party to be "unreasonable" under the circumstances.'" *Foster v. Chesapeake Ins.*, 933 F.2d 1207, 1219 (3d Cir. 1991) (citing *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1907)). That is, the forum selection clause will be enforced unless the party objecting to the clause's enforcement can establish "(1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable." *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983); *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, Civ. A. No. 21915382, 2020 WL 7022654, at *2 (D.N.J. Nov. 30, 2020). As other courts have observed, "unconscionability and lack of mutuality between the parties are not defined

14

in *Coastal Steel* as grounds on which to find a forum selection clause unenforceable." *C.I.N. Const., LLC v. Hunt Const. Grp., Inc.*, Civ. A. No. 08-5810, 2009 WL 2998965, at *6 (D.N.J. Sept. 18, 2009). Importantly, "[f]orum selection clauses are routinely upheld, even in situations involving adhesion contracts, unequal bargaining power, and the absence of negotiations over the clause." *Home Source Indus., LLC v. Freightquote.com, Inc.*, Civ. A. No. 14-2001, 2014 WL 6609051, at *5 (D.N.J. Nov. 19, 2014).

Even though Plaintiff has not submitted arguments under the three recognized grounds for finding forum selection clauses unreasonable, the Court will still review Plaintiff's arguments for procedural and substantive unconscionability. Plaintiff contends the forum selection clause is procedurally unconscionable because the design of the application buried the Customer Agreement, so it is not surprising "Plaintiff did not pay any attention to the embedded customer agreement." (ECF No. 24 at 20–21.) Additionally, Plaintiff points to the fact that it only takes five minutes to apply for and open an account with GCH as evidence that "Defendant has known all along that its 2019 Interface has fooled nearly all of its users not to click and read the customer agreement containing the forum selection clause when they clicked the box saying they have read and agreed to the statement" with the links to the agreement. (ECF No. 24 at 22.)

First, because the Court found the format and layout of the application provided Plaintiff with reasonable notice of the Customer Agreement, Plaintiff's argument that GCH's interface "buried" the terms of the Customer Agreement is unavailing. To the extent Plaintiff argues he "did not pay any attention" to the Customer Agreement, the Court is unpersuaded, as "[a] failure to read the terms and conditions, and specifically, the forum selection clause, does not render the forum selection clause invalid or diminish its force and effect." *Home Source Indus.*, 2014 WL 6609051, at *5; *Toll Bros., Inc. v. Fields*, Civ. A. No. 10-04606, 2011 WL 463090, at *3 (D.N.J. Feb. 4,

2011) ("[F]ailure 'to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading.'" (quoting *Young v. Prudential Ins. Co. of Am.*, 688 A.2d 1069, 1077 (N.J. Super. Ct. App. Div. 1997))). GCH's alleged representation that the account application process takes only five minutes, (*see* ECF No. ¶ 8; ECF No. 24 at 5), does not render the forum selection clause procedurally unconscionable either. *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 643 (S.D.N.Y. 2020) (enforcing agreement despite the plaintiff's argument that "Defendant's advertising estimates that opening a self-directed account can be accomplished in only ten minutes," which "suggests that Defendant does not encourage or expect applicants to read its disclosures in their entirety"). Therefore, the forum selection clause is not procedurally unconscionable.

Regarding substantive unconscionability, Plaintiff argues the "forum selection clause was 'snuck' into Plaintiff's relationship with GainCap without Plaintiff's consent" and because "[t]he design of the 2019 Interface also makes it entirely unexpected for Plaintiff to be signing a contract with a subsidiary of GainCap with which he did not even know he had any connection." (ECF No. 24 at 23.) That is, Plaintiff did not believe he was only dealing with GCH as a subsidiary. (Zhang Decl. (ECF No. 24-1) ¶ 14.) Plaintiff's support for this appears to come from an "About Us" page, attached as Exhibit A to Plaintiff's opposition. (Ex. A to Zhang Decl. (ECF No. 24-2).) The "About Us" page, translated from Chinese to English by Plaintiff's interpreter, makes no mention of subsidiaries. (*See id.*) However, a translated version of the same page presented by GCH suggests Plaintiff's translator purposely left out mention of the subsidiaries in the translation. (Ex. C to Wong Decl. (ECF No. 26-4) (presenting redlined version of Plaintiff's translation of the "About Us" page and demonstrating Plaintiff left out the following: GCH is "regulated in 7 jurisdictions worldwide through our *subsidiaries* . . . .") (emphasis added).) Plaintiff also stated he believed he

16

could litigate in the United States, and not the Cayman Islands, because GCH was "listed on the NYSE and regulated by U.S. regulatory bodies such as NFA and CFTC." (ECF No. 24-1 ¶ 33.) However, the "About Us" page Plaintiff relies upon—even the one provided by Plaintiff's own translator—lists GCH as subject to the regulatory authority of the Cayman Islands Monetary Authority. (*See* ECF No. 24-2.) The fact that the Cayman Islands is listed as one of GCH's regulators forecloses Plaintiff's argument that the forum selection clause was so unexpected as to render it substantively unconscionable.

### B. The Application of the Forum Selection Clause

GCH argues the forum selection at issue applies to this action because it covers all of Plaintiff's claims. (ECF No. 17-1 at 13–15.) Plaintiff argues nearly all of the loss at issue in this case arises out of his first account opened with GCH in 2017 ("Account I"), which is not subject to the forum selection clause. (ECF No. 24 at 6–7.) Additionally, Plaintiff contends GCH has no standing to evoke the forum selection clause under the second account Plaintiff opened in 2019 ("Account II"). The Court agrees with GCH.

The forum selection clause at issue, according to Plaintiff, provides the following:

> The Agreement and our relations before we entered into this Agreement shall be governed and construed in accordance with Cayman Islands Law. The Courts of Cayman Islands will have exclusive jurisdiction over any claim or matter arising under or in connection with the Agreement and the legal relationships established by the Agreement.

(Ex. C to Xu Decl. (ECF No. 17-5) ¶¶ 33.1–33.2.) Courts routinely find forum selection clauses properly apply to claims arising out of contractual relationships, like Plaintiff's tort and contract claims here. *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 68 (3d Cir. 2018) (providing that "we recognize that we should not permit a party to avoid a forum selection clause

simply by pleading non-contract claims"); *Crescent Int'l, Inc. v. Avatar Communities, Inc.*, 857 F.2d 943, 944 (3d Cir. 1988) (finding that "pleading alternate non-contractual theories is not alone enough to avoid a forum selection clause if the claims asserted arise out of the contractual relation and implicate the contract's terms"); *Coastal Steel Corp.*, 709 F.2d at 203 (same). Therefore, the forum selection clause applies to Plaintiff's claims.

Plaintiff attempts to avoid application of the forum selection clause by arguing the clause cannot apply to Account I—the account that makes up "95% of loss at issue in this case." (ECF No. 24 at 6.) As discussed, by checking the box on the account application, Plaintiff manifested an intent to be bound by the Customer Agreement's terms. The Customer Agreement itself clarifies its application to Account I and Account II, as it "supersedes all our previous terms and conditions and any amendments thereto" and applies "separately to each Account." (ECF No. 17-5 ¶¶ 1.1, 3.1.) Further, the Customer Agreement "governs [GCH's] trading services and all transactions we conduct with you." (*Id.* ¶ 1.1.) Therefore, by manifesting assent to the Customer Agreement when opening Account II in 2019, the terms within the Customer Agreement applied to all accounts Plaintiff had with GCH at the time, including Account I.

Lastly, Plaintiff argues GCH lacks standing to enforce the forum selection clause. (ECF No. 24 at 9–11.) The Third Circuit has held "that a forum-selection clause 'can be enforced only by the signator[y] to [the] agreement[].'" *In re: Howmedica Osteonics Corp*, 867 F.3d 390, 407 (3d Cir. 2017) (quoting *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1293–97 (3d Cir. 1996)). However, "[u]nder traditional principles of contract law, non-signatories may be bound by a forum selection clause if they are intended third-party beneficiaries of the contract, or if they are closely related parties." *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 59 (3d Cir. 2018). "In determining whether a non-signatory is closely related to a contract, courts consider

18

the non-signatory's ownership of the signatory, its involvement in the negotiations, the relationship between the two parties and whether the non-signatory received a direct benefit from the agreement." *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 219 (3d Cir. 2015). As Plaintiff points out, the court in *McGraw-Hill* found the "closely-related doctrine" inapplicable under the facts presented before the court. (ECF No. 24 at 10.) In that case, McGraw-Hill attempted to argue the "closely-related doctrine" should apply to bind certain photographers to agreements between McGraw-Hill and Corbis Corporation, a stock photography agency. *In re McGraw-Hill*, 909 F.3d at 62–63. The Third Circuit declined to apply the "closely-related doctrine," in part, because it was "clear the photographers were not in an ownership or subsidiary relationship with Corbis." *Id.* at 63. Here, GCH, the parent of GGMI, is trying to enforce the forum selection clause against Plaintiff. Importantly, the Customer Agreement explicitly provides for enforcement by any of GGMI's affiliates. (ECF No. 17-5 ¶ 31.5 ("The Agreement may, however, be enforced by any of our Affiliates. We do require the consent of our Affiliates or any other third party to vary, amend, modify, suspend, cancel or terminate any provision of the Agreement.").) Therefore, due to the Customer Agreement's explicit terms, it is foreseeable that GCH, as GGMI's corporate parent, could enforce the forum selection clause against Plaintiff. *In re McGraw-Hill*, 909 F.3d at 64. Accordingly, the forum selection clause applies to both Account I and II.

### C. *Forum Non Conveniens* Analysis

Because the forum-selection clause was not unreasonable and applies to Plaintiff's claims, the Court must analyze the *Atlantic Marine* factors.

#### 1. Availability of an Adequate Alternative Forum

"A successful *forum non conveniens* motion also requires the availability of an adequate alternative forum." *Wilmot v. Marriott Hurghada Mgmt., Inc.*, 712 F. App'x 200, 203 (3d Cir.

2017) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)). An alternative forum "is available if all defendants are amenable to process there" and it is generally adequate if "the plaintiff's claim is cognizable in the forum's courts." *Id.* (citing *Piper*, 454 U.S. at 254). Here, the alternative forum the Court must consider is the Cayman Islands. A defendant is "amenable to process" in an alternative forum if they consent to jurisdiction in the alternative forum. *See id.* at 204 (finding that the United Kingdom and Egypt were both adequate alternative fora because the defendant "consented to jurisdiction and service of process in both countries"); *Meridian Consulting I Corp.*, 2021 WL 689132, at *15 (finding that "because EuroTec is located in Ontario and also agreed to jurisdiction there, I am satisfied that it would be amenable to process there"). Here, GCH consented to the jurisdiction of the Cayman Islands by selecting it as an alternative forum in its forum selection clause. *See Hage*, 2020 WL 3056442, at *7 (finding that the defendant was "amenable to process in Texas state court" because it "expressly consented to the jurisdiction of the Texas state court by agreeing to the Texas forum-selection clause"). Therefore, GCH is amenable to process in the Cayman Islands. Additionally, while Plaintiff repeatedly disputes his claims' connection to the Cayman Islands, he does not argue his claims would not be cognizable in Cayman courts. (*See generally* ECF No. 24.) Because Plaintiff has not demonstrated he would be "deprived of any remedy" if required to litigate his claims in the Cayman Islands, *Trotter v. 7R Holdings LLC*, 873 F.3d 435, 434–44 (3d Cir. 2017), the Court finds the Cayman Islands is an adequate alternative forum.

### 2. Public Interest Factors

The factors courts consider on a motion to dismiss for *forum non conveniens* include:

> the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at

> home with the law that must govern the action; the avoidance of
> unnecessary problems in conflict of laws, or in the application of
> foreign law; and the unfairness of burdening citizens in an unrelated
> forum with jury duty.

*Piper Aircraft*, 454 U.S. at 241 n.6 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)).

"This list of considerations to be balanced is by no means exhaustive, and some factors may not

be relevant in the context of a particular case." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 528–

29 (1988). The Court will not address any private interest factors because, as noted above, when a

valid forum selection clause applies, courts "must deem the private-interest factors to weigh

entirely in favor of the preselected forum." *Atl. Marine*, 571 U.S. at 64. Therefore, the arguments

Plaintiff presents regarding the private interests in this action are unpersuasive. (ECF No. 24 at 7–

9.) Plaintiff argues the public interest "certainly does not favor Cayman Islands" because "New

Jersey is the corporate headquarters of GainCap, which is the owner of forex.com, the platform

that Plaintiff signed up Account I," and "[t]he bank account that received Plaintiff's deposit is

located in New York with the listed address of the account owner being in New Jersey." (*Id.* at 9.)

Plaintiff also argues the "State of New Jersey and the U.S. federal government certainly have

significant interests in preventing a New Jersey-based corporation from engaging in the

wrongdoings alleged in the Complaint." (*Id.*) However, none of these arguments involve the public

factors. *See Gulf Oil*, 330 U.S. at 509. Instead, a few public interest factors support dismissal. First,

New Jersey does not have a "local interest" in deciding a "localized controvers[y]" at home, since

Plaintiff is a Chinese resident that contracted with a Cayman Islands business regulated by the

Cayman Islands Monetary Authority. *See Atl. Marine*, 571 U.S. at 62 n.6 (listing private and public

interest factors). And second, since Cayman law applies to the claims in this action, "having a trial

of a diversity case in a forum that is at home with the law that must govern" also favors the Cayman

Islands in this diversity action. Therefore, Plaintiff has not carried his burden under either prong of the *forum non conveniens* inquiry.

Because Plaintiff has not carried his burden, the Court dismisses this action for *forum non conveniens* and need not reach the issue of whether the Complaint should be dismissed for failure to state a claim under Rule 12(b)(6). *See Hage*, 2020 WL 3056442, at *9 (dismissing under doctrine of *forum non conveniens* and deciding not to reach "merits of whether the Complaint fails to state a claim"). Additionally, because the Court finds amendment would be futile, dismissal of Plaintiff's Complaint pursuant to the doctrine of *forum non conveniens* is with prejudice. "When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Hage*, 2020 WL 3056442, at *9 (dismissing case for *forum non conveniens* and dismissing complaint with prejudice because "granting Plaintiff leave to amend the Complaint would be futile"); *Chisso Am., Inc. v. M/V HANJIN OSAKA*, 307 F. Supp. 2d 621, 626 (D.N.J. 2003) (granting motion to dismiss based on forum selection clause and dismissing complaint with prejudice).

**IV. CONCLUSION**

For the reasons set forth above, GCH's Motion to Dismiss pursuant to the doctrine of *forum non conveniens* is **GRANTED** and its Motion to Dismiss for failure to state a claim is **DENIED AS MOOT**.

Date: May 25, 2021

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**